**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**THOMAS GESUALDI,** *et al.***,**

                       **Plaintiffs,**             <u>**OPINION & ORDER**</u>

    **-against-**                      **17-CV-7455 (NG) (RML)**

**ADVANCED READY MIX CORP.,** *et al.***,**

                       **Defendants.**
------------------------------------------------------------x
**GERSHON, United States District Judge:**

Plaintiffs, the trustees and fiduciaries (the "Trustees") of the Local 282 Welfare, Pension, Annuity, Job Training, and Vacation and Sick Leave Trust Funds (collectively, the "Funds"), bring this action under Sections 502 and 515 of the Employee Income Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132, 1145, and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to recover contributions allegedly owed to the Funds by defendants. Plaintiffs now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for partial summary judgment against defendants Rocco Manzione ("Manzione"), Rapid Ready Mix Supply Corp. ("Rapid Ready Mix"), All American Concrete Supply Corp. ("All American Concrete Supply"), All American Transit Mix Corp. ("All American Transit"), and Advanced Concrete Leasing Supply Corp. ("Advanced Concrete"). Plaintiffs principally argue that the latter two corporations are alter egos of, and/or part of the same single employer group as, two bankrupt corporations owned by Manzione—Advanced Ready Mix Corp. ("Advanced Ready Mix") and Advanced Transit Mix Corp. ("Advanced Transit Mix")—and are therefore jointly and severally liable for the contributions owed to the Funds by the bankrupt corporations.[1]

---

[1] As discussed below, the bankrupt corporations, along with Rapid Ready Mix and All American Concrete Supply, are members of an "Enterprise" that also includes at least two other Manzione-

Plaintiffs also move for partial summary judgment against defendant Manzione, alleging that he is jointly and severally liable for contributions owed by All American Transit and Advanced Concrete because he fraudulently used these two non-union entities to perform union work with union employees.  Finally, plaintiffs seek findings as to three damages issues.  For the reasons set forth below, plaintiffs' motion for partial summary judgment is granted as to liability and as to one of the damages issues, but is denied as to two of the damages issues.

## BACKGROUND

This section briefly describes the long and complicated procedural history of the litigation between plaintiffs and defendants.  Although this history includes some of the undisputed facts, most of those facts are set forth in the Discussion section below.

The Funds are multiemployer employee benefit plans under Sections 3(3) and 3(37) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(37). They are jointly administered by a Board of Trustees and maintained pursuant to Restated Agreements and Declarations of Trust (the "Trust Agreement") for the purposes of collecting and receiving contributions from employers and providing benefits to eligible participants. The amount of those contributions is prescribed in various collective bargaining agreements ("CBAs") between employers and Building Material Teamsters Local 282 ("the Union" or "Local 282").

Since at least October 24, 2008, Advanced Ready Mix, a company owned by Manzione, has been bound to CBAs between the Union and the Association of New York City Concrete Producers, Inc., and Independents (the "Concrete Producers CBAs").  The Concrete Producers

---

owned corporations: Rapid Transit Mix Corp. and Advanced Ready Mix Supply Corp.  Plaintiffs have already established that the Enterprise constitutes a single employer. *Gesualdi v. Advanced Ready Mix Corp.*, 2020 WL 5704716, at *4 (E.D.N.Y. Aug. 25, 2020).  Accordingly, plaintiffs are also arguing that All American Transit and Advanced Concrete are part of the same single employer unit as the Enterprise.

CBAs require Advanced Ready Mix to contribute to the Funds on behalf of its employees who are covered by the CBAs, at certain rates for each hour of covered employment. Along with the contributions, Advanced Ready Mix is required to send the Funds weekly remittance reports listing the employees who performed work covered by the CBAs and the number of hours each employee performed this work.

On July 30, 2010, the Funds commenced an ERISA action against Advanced Ready Mix in this district—*Gesualdi v. Advanced Ready Mix Corp.*, No. 10-CV-3499 (SLT) ("*Gesualdi I*")— alleging that Advanced Ready Mix had failed to pay contributions for most of the weeks in March, April, and May 2010. This litigation was resolved in February 2013 with the entry of a Consent Judgment and Limited Forbearance Agreement (the "Consent Judgment"). Under the terms of the Consent Judgment, Advanced Ready Mix agreed to have judgment entered against it in the amount of $214,061.62, which included $114,525 in unpaid contributions for the weeks between January 7, 2011, and February 24, 2012. However, the agreement provided that the Funds would accept $178,000 in satisfaction of that judgment and set a specific schedule for the payment of that amount: $58,000 upon execution of the Consent Judgment and $10,000 per month commencing on February 15, 2013.

On March 28, 2013, less than two months after Judge Townes "so ordered" the Consent Judgment, the Trustees filed an involuntary bankruptcy petition against Advanced Ready Mix in the United States Bankruptcy Court for the Eastern District of New York. The Trustees alleged that they had received only the initial payment of $58,000 and principally sought to recover the amount still owed under the Consent Judgment. During the course of the bankruptcy litigation, the Trustees alleged that they were also owed unpaid contributions that the Funds had discovered

during an audit of the books and records of Advanced Ready Mix and Rapid Ready Mix for the period from October 24, 2008, through December 31, 2009.

In 2013, just about the time the involuntary bankruptcy petition was filed, All American Transit began operations. Manzione's eldest daughter, Catherine Manzione Pastoressa ("Pastoressa"), the president and sole shareholder of the corporation, claims that she started the company herself. By her own account, however, she was only 22 years old at the time and had no experience in the concrete business, aside from doing some bookkeeping and handling billing inquires for one of her father's companies. (Deposition of Catherine Manzione ("Pastoressa Dep.") at 7–8, 11)[2]

As a recent college graduate, Pastoressa did not have "that much" capital. (*Id.* at 11) To start her ready-mix concrete company, she used "old trucks from [her] father." (*Id.*) At his deposition, Manzione testified that the trucks "were in the junk pile" and that his daughter "had her mechanics get [them] on the road." (Deposition of Rocco Manzione ("Manzione Dep.") at 10) Both Manzione and Pastoressa claim that All American Transit paid for the trucks over time, but Pastoressa could not recall any contracts relating to the sale of the trucks or the location of records of the payments. (Pastoressa Dep. at 11–12) Manzione was "not too sure" if there were any documents relating to the trucks, testifying that there were no negotiations or anything "very formal." (Manzione Dep. at 10)

In September 2014, the Trustees and Advanced Ready Mix resolved the bankruptcy case by entering into a Stipulation of Settlement (the "Stipulation"). The Stipulation provides that, upon entry of an order dismissing the bankruptcy action, Advanced Ready Mix would cause

---

[2] Although Pastoressa was not yet married at the time she was deposed, I will refer to her by her married name to avoid confusion with her father, Manzione.

$225,000 to be wired to the Funds.  (Stipulation at ¶ 1)  That amount was in satisfaction of the amount owed under the Consent Judgment and the amount of unpaid contributions owed by Advanced Ready Mix and Rapid Ready Mix for the period from October 24, 2008, through December 31, 2009.  (*Id.*)

The Stipulation also contains elaborate provisions related to "the Enterprise," which encompasses "all non-publically [*sic*] traded existing businesses which have or had engaged in services for [*sic*] which would be defined as 'covered work' under the CBA with Local 282 and in which Manzione; (a) owns an equity or voting interest; (b) is an officer, director, member, or shareholder; or (c) directly or indirectly controls through participation in management or voting control."  (Stipulation at ¶ 5)  Under the terms of the Stipulation, Manzione "agrees that to the extent that any current or future member of the Enterprise engages in business or services for [*sic*] which would be defined as 'covered work' under the CBA with Local 282, such Enterprise shall be bound by [Advanced Ready Mix's] CBA with Local 282."  (*Id.* at ¶ 6)  The Stipulation attaches a "Schedule A" listing the businesses which, Manzione represented, were then the only businesses meeting the criteria for inclusion in the Enterprise.  The schedule lists six businesses—Rapid Ready Mix, Advanced Ready Mix, Rapid Transit Mix Corp. ("Rapid Transit Mix"), Advanced Transit Mix, Advanced Ready Mix Supply Corp. ("Advanced Ready Mix Supply"), and All American Concrete Supply.  It does not include All American Transit, but the Stipulation makes it clear that the list is not static.  Indeed, the Stipulation obligates Manzione "to identify any and all new entities which become a member of the Enterprise within ten calendar days of the date on which said new member met the definition of the term Enterprise …."  (*Id.* at ¶ 7)

In November 2015, the Trustees filed another lawsuit in this district—*Gesualdi v. Advanced Ready Mix Corp.*, No. 15-CV-6374 (ADS) ("*Gesualdi II*")—naming eight defendants:  Manzione,

All American Concrete Corp. ("All American Concrete"), and the six businesses listed as members of the Enterprise in Schedule A to the Stipulation (collectively, the "2015 Defendants"). The complaint alleged, among other things, that the corporate defendants had refused to submit to audits of their books and records for the period commencing December 26, 2009, and had failed to pay certain contributions. The Trustees sought to hold Manzione jointly and severally liable for the amounts owed by the corporate defendants, alleging that he had "knowingly used his control over the [businesses] … in an ongoing scheme to defraud the Funds of contributions due." (Complaint in *Gesualdi II* at 2)

In May 2016, the Trustees moved to amend the complaint, seeking to substitute All American Transit for All American Concrete. The amended complaint, filed June 3, 2016, alleged that Manzione and his daughter were both principals of All American Transit but that Manzione "exercise[d] control over All American Transit's business and financial operations." (Amended Complaint in *Gesualdi II* at ¶¶ 21–22) Although these allegations suggested that All American Transit met criteria for inclusion in the Enterprise, the Trustees made no such assertion. Rather, the Trustees alleged, upon information and belief, that "Advanced Ready Mix and All American Transit share an alter ego, single employer and/or joint employer relationship and, therefore, all driving performed by drivers employed by Advanced Ready Mix and/or All American Transit was work performed in employment covered by and subject to the terms of the CBAs." (*Id.* at ¶ 78)

Sometime in August 2016, the Trustees and the 2015 Defendants entered into an agreement (the "August 2016 Agreement") which created a framework for the subsequent settlement of the action. Under that agreement, the corporate defendants were to provide copies of their books and records, enabling the Funds to conduct an audit for the period commencing December 26, 2009. All American Transit agreed to enter into a collective bargaining agreement with the Union which

would obligate it to file remittance reports and remit contributions for covered work as of the date of the CBA.  Plaintiffs agreed that, after the defendants satisfied these obligations, the Trustees would stipulate to dismissal of the lawsuit without prejudice to refiling any and all of the allegations in the amended complaint.

On May 1, 2017, All American Transit signed an agreement with the Union, binding All American Transit to the New York City Ready-Mix Concrete, Market Recovery Contract for the period 2014–2019 (the "Market Recovery CBA").  Under the terms of that CBA, All American Transit is prohibited from bidding for work that is not "market recovery work," as defined in the agreement.  The Market Recovery CBA expressly permits All American Transit to hire outside ready mix trucks when its "available, suitable ready mix trucks are in use."  (Market Recovery CBA, § 16(C))  However, All American Transit can hire trucks only from entities whose drivers receive "wages, working conditions, benefits and standards of employment at least as favorable" as those contained in the Market Recovery CBA.  (*Id.*)  All American Transit is required to notify the Funds on a weekly basis of the number of trucks hired, the supplier of the trucks, and the hours worked by each truck.  (*Id.*)

On May 22, 2017—about three weeks after the Market Recovery CBA was executed—the parties stipulated to dismissal of *Gesualdi II* pursuant to Federal Rule of Civil Procedure 41(a)(1). The parties agreed that the action would be dismissed without prejudice but that the dismissal would not constitute an adjudication on the merits.

On December 22, 2017, the Trustees commenced this ERISA action against Advanced Ready Mix and the other five members of the Enterprise, All American Transit, All American Ready Mix Supply Corp. ("All American Ready Mix"), and Advanced Concrete (collectively, the "Companies"), and Manzione.  The Trustees principally seek an order permitting them to audit the

7

books and records of the Companies for all unaudited periods and to collect any contribution delinquencies identified by the audits and estimated contributions for all unaudited periods, with interest and liquidated damages. The Trustees also seek to hold Manzione jointly and severally liable for contributions and damages owed by the Companies to the Funds on the theory that he has engaged in an ongoing scheme to defraud the Funds of contributions.

The Trustees' complaint alleges that three of the Companies are bound by CBAs with the Union. First, the complaint alleges that Advanced Ready Mix is bound to the Concrete Producers CBAs for the periods from July 1, 2008, through June 30, 2011 (the "2011 CBA"), from July 1, 2011, through June 30, 2016 (the "2016 CBA"), and from July 1, 2016, through June 30, 2020 (the "2020 CBA"). (Complaint at ¶ 28) Second, the complaint alleges that All American Transit is bound to the Market Recovery CBA for the period from May 1, 2017, through June 30, 2019. (*Id.* at ¶ 36) Third, the pleading alleges that All American Ready Mix is bound to the 2016 CBA and the 2020 CBA. (*Id.* at ¶ 41) Defendants admit these allegations in an answer filed on behalf of all ten defendants. (Answer at ¶¶ 28, 36, 41)

The complaint acknowledges that there were times during which All American Transit did not have a CBA with the Union and that there were no times in which Advanced Concrete had a CBA. (*Id.* at ¶¶ 73–74) Plaintiffs therefore seek to hold these two corporations liable for contributions during those times under an alter-ego and/or single employer theory.

Although I assume familiarity with the history of this case, I will now briefly recap the relevant prior motions and orders. In the first such motion, plaintiffs sought partial summary judgment against seven of the defendants: All American Transit and the six members of the Enterprise listed in Schedule A of the Stipulation resolving the 2013 bankruptcy case. Plaintiffs argued that the six members of the Enterprise constitute a single employer and are alter egos of

one another but did not make that argument with respect to All American Transit.  The motion sought to recover from All American Transit $80,496.88 in unpaid contributions owed under the Market Recovery CBA; $14,982.10 in interest on that amount as of July 31, 2019; and $24,068.34 in liquidated damages.

In an order dated August 25, 2020, I held, among other things, that the six members of the Enterprise were a single employer and thus were jointly and severally liable for debts owed by Advanced Ready Mix to the Funds.  In reaching this conclusion, I primarily relied on concessions contained in the Stipulation.  Because plaintiffs filed a petition for involuntary bankruptcy against All American Transit on July 29, 2020, while their partial summary judgment motion was pending, I could not address the motion for partial summary against that defendant.

After the bankruptcy court dismissed the involuntary bankruptcy against All American Transit on January 22, 2021, the parties filed supplemental briefs on plaintiffs' partial summary judgment motion against that defendant.  By that time, All American Transit had paid $39,846.39 of the $80,496.88 in unpaid contributions, so plaintiffs sought only $40,650.49 for the contributions reported through April 2019.  Plaintiff continued to seek the $14,982.10 in interest and $24,068.34 in liquidated damages related to these contributions.  But plaintiffs also sought $873.36 in interest on the $39,846.39 in contributions that All American Transit had paid; $2,567.62 in interest and $17,407.76 in liquidated damages for contributions that were paid late between May 2019 and August 2020; and $128,137.96 in unpaid contributions reported on remittance reports between May 2019 and August 2020, plus $23,597.23 in interest and $28,843.55 in liquidated damages on those contributions.

In an order dated December 2, 2021, I granted that motion in part and denied it in part, holding that, "[b]ased on the uncontested amounts submitted by plaintiffs, plaintiffs are entitled to

an award against All American [Transit] … of \$168,788.45 in unpaid contributions and \$42,020.31 in interest on both unpaid and late-paid contributions (through March 15, 2021)." *Gesualdi v. Advanced Ready Mix Corp.*, 2021 WL 5712072, at \*4 (E.D.N.Y. Dec. 2, 2021).  I also awarded plaintiffs 20 percent liquidated damages on all unpaid contributions and those paid late on or after December 22, 2017.  I awarded \$46,251.31 in liquidated damages on contributions that were paid late or owed starting in May 2019, but directed the parties to submit a stipulation setting forth the amount of those liquidated damages owed for the period prior to May 2019.  In addition, I directed plaintiffs to notify it and All American Transit if they sought interest that accrued after March 16, 2021, and, if so, to calculate the specific amount.

After plaintiffs filed the submissions as directed in the December 2, 2021, order, I issued an order dated January 7, 2022, awarding plaintiffs an additional \$7,969.28 in liquidated damages and \$22,807.25 in interest.  Plaintiffs then moved pursuant to Federal Rule of Civil Procedure 54(b) for entry of partial final judgment against All American Transit in the amount of \$287,836.60.  I granted that motion, *Gesualdi v. Advanced Ready Mix Corp.*, 2022 WL 2803256, at \*4 (E.D.N.Y. July 18, 2022), and the Clerk of Court entered partial final judgment against All American Transit in the amount of \$287,836.60 on July 19, 2022.  That partial final judgment also dismissed any claims that sought to hold other defendants liable for All American Transit's remittance report-based delinquencies.

Plaintiff now files another motion for partial summary judgment, seeking three types of relief.  First, plaintiff seeks a determination that All American Transit and Advanced Concrete are within the same alter-ego and single employer group as Advanced Ready Mix and Advanced Transit Mix.  Such a determination would make All American Transit and Advanced Concrete jointly and severally liable for contributions owed to the Funds by Advanced Ready Mix and

10

Advanced Transit Mix, whose debts were discharged in Chapter 7 bankruptcy proceedings. Second, plaintiffs seek to hold Manzione personally liable for contributions owed by any of the Companies. Plaintiffs argue that Manzione was the corporate head of all these corporations and is personally responsible for committing fraud on the Funds by using certain non-union companies to avoid paying contributions. Third, plaintiffs seek resolution of several issues relevant to the calculation of damages, the exact amount of which will be addressed subsequently.

## DISCUSSION

A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the burden is met, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on such a motion, a court is required to "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994).

"Whether a jury could reasonably find for either party … cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant" at trial. *Anderson*, 477 U.S. at 254. "[P]recedent from within the Second Circuit suggests that only a preponderance of the evidence is required to establish alter ego or single employer status." *Trustees of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 335 (E.D.N.Y. 2017). In contrast, "to recover under a theory of common law fraud in New York, plaintiffs must demonstrate liability by clear and convincing evidence." *Marini v. Adamo*, 995 F. Supp. 2d 155, 178 (E.D.N.Y. 2014).

B.  The Alter Ego and Single Employer Doctrines

Plaintiffs argue that All American Transit and Advanced Concrete are "within the same alter-ego and single employer group as two bankrupt entities, Advanced Ready Mix … and Advanced Transit Mix" (Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Plaintiffs' Memo") at 1), both of which are members of the Enterprise. Employers that are determined to be alter egos, or to function as a single employer/single unit, are "jointly and severally liable for each other's debts and obligations, including financial obligations under [a] collective bargaining agreement." *Lihli Fashions Corp., Inc. v. N.L.R.B.*, 80 F.3d 743, 748 (2d Cir.1996).

The alter ego and single employer doctrines are "conceptually distinct." *Id.* "The focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." *Id.* (internal quotation marks and citations omitted). The single employer doctrine, in contrast, focuses on determining if the entities "are part of a single integrated enterprise." *Id.* at 747 (internal quotation marks and citation omitted). Single

12

employer status is "characterized by absence of an arm's length relationship found among unintegrated companies." *Id.* (internal quotation marks and citation omitted). The Supreme Court has "established a four-factor test to determine 'single employer' status." *Id.* (citing *Radio & Television Broad. Technicians Loc. Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam)). The four factors are the "interrelation of operations, common management, centralized control of labor relations and common ownership," but other factors, including the use of common office facilities and equipment and family connections between or among the various enterprises, are also relevant. *Id.* "To demonstrate single employer status, not every factor need be present, and no particular factor is controlling." *Id.* If two entities constitute a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single appropriate bargaining unit. *Stardyne, Inc. v. N.L.R.B.*, 41 F.3d 141, 144 (3d Cir. 1994).

The determinations of both single employer and alter ego status are questions of fact. *Goodman Piping Products, Inc. v. N.L.R.B.*, 741 F.2d 10, 11 (2d Cir. 1984) (per curiam). Accordingly, the determinations are "inappropriate for summary judgment unless the factfinder could reach only one reasonable conclusion based on the undisputed facts." *Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P Concrete Co.*, 2023 WL 3948751, at *8 (E.D.N.Y. June 12, 2023).

For the reasons discussed below, I find that any reasonable factfinder faced with the record facts of this case would have to conclude that All American Transit, Advanced Concrete, and the members of the Manzione-owned Enterprise constitute a single employer. In light of this finding, I do not reach the question of whether All American Transit and Advanced Concrete are also alter egos of one another or of members of the Enterprise.

1. <u>All American Transit</u>

In this case, no reasonable juror could find that there was an arm's length relationship between All American Transit and Advanced Ready Mix, Advanced Transit Mix, and the other members of the Enterprise. First, there is a close family connection between the owners of All American Transit and the Enterprise. Defendants do not dispute that All American Transit, Advanced Transit Mix, and Advanced Ready Mix are all owned by members of the Manzione family. (Defendants' Memorandum of Law in Opposition to the Instant Motion ("Defendants' Memo") at 13) The parties agree that Manzione owns Advanced Ready Mix (Plaintiffs' Rule 56.1 Statement ("Pl. 56.1") at ¶ 43; Defendants' Rule 56.1 Counterstatement ("Def. 56.1") at ¶ 43), and Manzione admits that he also owns Advanced Transit Mix. (Declaration of Rocco Manzione at ¶ 2) Manzione's eldest daughter, Pastoressa, is the President and sole shareholder of All American Transit. (Declaration of Catherine Manzione Pastoressa ("Pastoressa Declaration") at ¶¶ 1–2)

As a result of the close family connection, there has never been an arm's length relationship between All American Transit and Manzione and his Companies. Indeed, the absence of an arm's length relationship has been readily apparent since All American Transit's inception in 2013. At that time, Pastoressa was a 22-year-old who had just graduated from college. She had no experience in the ready-mix concrete business, aside from part-time work doing bookkeeping and handling billing inquires for one of her father's companies.

The evidence is overwhelming that Manzione owns or controls All American Transit. Although Pastoressa is nominally the owner of All American Transit, Manzione has admitted that he actually owns it. Gerry Dwayne Hill, a driver employed by both Advanced Ready Mix and All American Transit, testified that Manzione told him that he owned both companies. Hill's testimony was corroborated by John Kennedy, who had been doing business with Manzione since

approximately 2010; he testified that, to the best of his knowledge, Manzione owned All American Transit. Kennedy recalled that he initially purchased concrete from Rapid Ready Mix—a member of the Enterprise—but that "they changed the name of the company … and then All American started supplying" the concrete. (Deposition of John Kennedy at 17)  Although Manzione never told Kennedy that he owned All American Transit "in those words" (*id.* at 84), at least one of All American Transit's drivers told him that Manzione did.

Even if he does not technically own All American Transit, Manzione is so instrumental in the operation of the corporation as to be effectively in control of it.  All American Transit's dispatcher, Mario Mendes, testified that he was interviewed for his job by both Pastoressa and Manzione. (Deposition of Mario Mendes ("Mendes Dep.") at 22)  According to Mendes, he was hired by Pastoressa "to run the place" and did precisely that.  (*Id.*)  Indeed, Pastoressa never personally interviewed the drivers who worked for All American Transit, leaving that task to the dispatcher. (Pastoressa Dep. at 54; Def. 56.1 at ¶ 1268; Reply 56.1 at ¶ 1268)  Although Mendes would speak to either Pastoressa or Manzione if issues arose, he testified that he "would have to go to Rocco directly" if the issue "was really prevalent, a dangerous situation." (Mendes Dep. at 21–22)  Similarly, Robert Cirulnick, a driver for All American Transit, testified that, if he had issues with trucks or the loads he was transporting, he would contact Manzione, not Pastoressa, "because he has the knowledge." (Deposition of Robert Cirulnick at 26–27)

Pastoressa denies that her father provided her with any "office assistance in terms of making contacts with potential customers." (Pastoressa Dep. at 20)  Rather, Pastoressa claims she was able to hire "a sales guy" in order to find customers (*id.* at 20), despite not having "that much" capital (*id.* at 11).  Manzione denies that he provided his daughter with what little capital she did have, and Pastoressa does not recall his providing her with financial assistance.  However, while

15

there may be no "dispositive evidence" as to the source of the capital (Oral Arg. Transcript ("Tr.") 4), defendants' counsel conceded at oral argument, "[i]t's really not in dispute here that Rocco Manzione helped his daughter get on her feet to get into this business" and to "establish herself in the industry." (Tr. 7–8)  It is undisputed that the trucks originally used by All American Transit were owned by Manzione (Pl. 56.1 at ¶ 1170; Def. 56.1 at ¶ 1170) and that those trucks were stored at a yard owned by Pastoressa's mother, Antonietta, or by a company owned by Antonietta (Pl. 56.1 at ¶ 1175; Def. 56.1 at ¶ 1175).

Although both Manzione and Pastoressa testified that All American Transit was paying for the trucks over time, the overwhelming evidence contradicts this claim.  Manzione admits that he and his daughter never "negotiated specifically how much" All American Transit would pay. (Manzione Dep. at 10)  Indeed, he was "not too sure" that there were any written documents reflecting their arrangement, which he did not "think was … very formal." (*Id.*)  Pastoressa could not recall if there was even paperwork reflecting the trucks' transfer or if it was by verbal agreement and did not know where one could find records of any payments.  (Pastoressa Dep. at 11–12; Pl. 56.1 at ¶ 1171; Def. 56.1 at ¶ 1171)  In the absence of a negotiated price or any record of payments, no reasonable juror could find that Pastoressa was actually paying for the trucks in installments.

This sort of evidence of parental assistance is not necessarily dispositive.  For example, in *United Union of Roofers, Waterproofers, & Allied Workers Loc. No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17 (2d Cir. 2013), the Second Circuit upheld a district court's decision that similar evidence of parental assistance was counterbalanced by extensive "evidence at odds with a single employer claim." (*Id.* at 21)  In light of the conflicting evidence, the Second Circuit could not find that the district court had erred in rejecting the plaintiffs' single employer arguments.

16

In this case, unlike in *A.W. Farrell*, there is insufficient evidence to counterbalance the evidence of parental assistance.[3]  While Manzione claims that he "had no role at All American Transit" from 2013 to 2016 (Pl. 56.1 at ¶¶ 53–54; Def. 56.1 at ¶¶ 53–54), no reasonable juror could credit that claim.  Manzione and Pastoressa were jointly indicted for tax fraud relating to, among other things, the failure to pay federal income taxes and FICA taxes owed by All American Transit.  That indictment charged that, between June 2013 and September 2017, Manzione and Pastoressa were the owners and operators of All American Transit.  The presentence report, prepared after Manzione pleaded guilty to the failure to pay taxes owed by Advanced Transit Mix, incorporated the allegation that Manzione and Pastoressa jointly owned All American Transit.  Manzione did not contest this portion of the presentence report, which he characterized as "generally accurate." (Adler Decl., Ex. L, at L-1)

Even if Manzione had no formal role at All American Transit during its first few years of operation, the corporate credit card records reflect that All American Transit was paying Manzione family expenses during this period.  Most notably, the corporation's American Express card was used to pay thousands of dollars to the New York Institute of Technology on eight occasions between August 2014 and January 2016.  Manzione admitted that his daughter, Francesca, attended that college between 2013 and 2017.  (Adler Decl., Ex. E, at ¶ 20)  In addition, the American Express card was repeatedly used to pay for airline tickets for Manzione and other members of his family.

---

[3] Much of the evidence adduced by defendants relates to the alter ego theory, rather than the single employer theory.  For example, evidence tending to show that All American Transit did not share a business purpose or customers with the Manzione-owned Enterprise relates to an alter ego factor, rather than a single employer factor.  *See Truck Drivers Loc. Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991) ("business purpose" among the "hallmarks of the alter ego doctrine").

Manzione admits that he began helping to manage All American Transit in 2018 or 2019 (Manzione Dep. at 7), and there is ample evidence that Manzione was centrally involved in the operations of All American Transit by 2019.  Indeed, in an affidavit notarized on January 27, 2020, and filed in opposition to the motion for summary judgment of Park Insurance Company ("Park Insurance") in a state court case brought by Park Insurance to recover unpaid premiums from All American Transit, Manzione stated that he was the "Secretary of All American Transit."  (Adler Decl., Ex. I, at ¶ 1)  Representing that he was "fully familiar with the facts and circumstances" surrounding All American Transit's relationship with Park Insurance, Manzione stated that the insurance company "customarily did not send All American [Transit] detailed billing," but would telephone the company to demand payments allegedly owed.  (*Id.* at ¶¶ 1, 9–10)  Manzione himself responded to those demands, as evidenced by a chain of January 31, 2019, emails in which Manzione responded on behalf of All American Transit to Park Insurance's demand for immediate payment of delinquent premiums.  (Adler Decl., Ex. J)

According to a March 15, 2023, letter sent by Manzione's attorney, Milo Silberstein, to Judge Kovner, who presided over the tax evasion case against Manzione and Pastoressa, Manzione was so intimately involved with All American Transit that his incarceration had the effect of delaying civil litigation involving that corporation.  According to Silberstein, Manzione was not only an "essential witness" in the Park Insurance case, but also a "key witness" in All American Transit's state court action to recover over $1.2 million allegedly owed to it by Source Construction, Inc. (Adler Decl., Ex. G, at 1–2)  Silberstein represented that, although All American Transit was owned by Manzione's daughter, Manzione was "involved in the company" and "worked on [the] project" involving Source Construction.  (*Id.* at 1)

Manzione's May 2023 motion for compassionate release offers an explanation for Manzione's involvement in All American Transit's operations.  In that motion, Manzione argued that his daughter's inability to successfully operate the family's concrete businesses was a reason for permitting him to serve the remainder of his 30-month sentence for tax evasion in a halfway house or in home confinement.  Specifically, he opined that Pastoressa had been "overly optimistic" when she proposed operating the companies in his absence, "partly since the construction trade remains a 'man's world.'"  (Plaintiffs' Memo at 8 (quoting Motion for Compassionate Release, Doc. No. 83 in *United States v. Manzione*, No. 20-CR-461 (RPK))  He also represented that vendors had been reluctant to work with Pastoressa and that existing customers had refused to pay outstanding invoices, resulting in "several litigations."  (*Id.*) Pastoressa's sentencing memorandum in the criminal case expresses similar sentiments, stating that Pastoressa had "high expectations and fully intended to turn All American [Transit] into a successful concrete supply company," but "had limited experience in the industry."  (Pastoressa's Sentencing Memorandum, Doc. No. 54 in *United States v. Manzione*, No. 20-CR-461 (RPK), at 4)

The lack of an arm's length relationship between All American Transit and Advanced Ready Mix is also apparent from the interrelation of their operations and the lack of formality in their business relationship.  First, it is undisputed that in early 2019, All American Transit's trucks were loaded with concrete at Advanced Ready Mix's plant.  (Pl. 56.1 at ¶ 1176; Def. 56.1 at ¶ 1176)  Scott Greco, Advanced Ready Mix's "batcher"—the person responsible for loading concrete trucks—testified that this was because of an electrical problem at the All American Transit plant.  (*Id.*; Deposition of Scott Greco ("Greco Dep.") at 25)  According to Greco, the electrical problem began approximately four months prior to his mid-June 2019 deposition and was still unresolved at the time of his testimony.  (Greco Dep. at 25)  As a result, All American Transit's

19

dispatcher, Mendes, was working from Advanced Ready Mix's office, and All American Transit was using Advanced Ready Mix's computer and telephones.  (Mendes Dep. at 10)  At her October 2021 deposition, Pastoressa testified that All American Transit's trucks were still occasionally being loaded at plants owned by other companies, though she claimed she did not know why. (Pastoressa Dep. at 54)

All American Transit and Advanced Ready Mix also shared trucks, drivers, and facilities. According to Gerry Dwayne Hill, who drove for both companies, All American Transit's trucks were parked in one lot and Advanced Ready Mix's Trucks were parked in another.  Hill would be advised by text or verbally which yard to go to.   Hill not only worked for both companies in the same month, but sometimes worked for both on the same day.  On those days, he continued to use the same truck regardless of which company he was working for.

Mendes corroborates Hill's testimony.  At his June 2019 deposition, Mendes testified that, when All American Transit became too busy in the afternoon, Advanced Ready Mix drivers would do work for All American Transit.  Because the Advanced Ready Mix drivers had their own assigned trucks, they would use their Advanced Ready Mix trucks to do the work for All American Transit.  According to Mendes, if an Advanced Ready Mix driver worked for both Advanced Ready Mix and All American Transit on the same day, Advanced Ready Mix would pay for the full day of work.  (Pl. 56.1 at ¶ 1169; Def. 56.1 at ¶ 1169)  Mendes did not know if All American Transit compensated Advanced Ready Mix for the use of the truck and driver.  In addition, it is undisputed that All American Transit drivers would drive Advanced Ready Mix trucks when there were not enough All American Transit trucks available.  (Pl. 56.1 at ¶ 1177; Def. 56.1 at ¶ 1177; Mendes Dep. at 14–15)

There is no evidence that this co-mingling of personnel and equipment was attributable to truck hires permitted by CBAs or letters of understanding.  Indeed, this co-mingling reflects the informality that characterized interactions between All American Transit and the Enterprise.  All American Transit's dealings with non-Enterprise entities were well-documented by, among other things, the hundreds of invoices that All American Transit sent to third-party clients between December 2013 and December 2018.  (Pl. 56.1 at ¶¶ 585–1154; Def. 56.1 at ¶¶ 585–1154)  In contrast, there were no invoices or contracts relating to transactions between All American Transit and other members of the Enterprise.  Pastoressa testified that, although All American Transit rented trucks from Advanced Ready Mix, this was never memorialized in writing.  (Pl. 56.1 at ¶ 166; Def. 56.1 at ¶ 166; Pastoressa Dep. at 29)

To be sure, the record is replete with dozens of checks documenting the transfer of funds between All American Transit and members of the Enterprise.  But Pastoressa could not recall any written records relating to what these checks covered.  (Pl. 56.1 at ¶ 167; Def. 56.1 at ¶ 167; Pastoressa Dep. at 31–34)  According to plaintiffs, "there are at least $600,000 worth of transactions between these entities for which there are no supporting invoices, contracts or any documentation whatsoever." (Plaintiffs' Memo at 14)  This claim is at least partially substantiated by Manzione's Response to Written Deposition Questions, which responded to plaintiffs' request for information relating to a check written by Pastoressa to Advanced Transit Mix on May 19, 2015, and 43 checks that All American Transit wrote sometime between October 31, 2014, and June 29, 2016, payable to Advanced Transit Mix, Advanced Concrete, and All American Concrete.  Manzione did not have records regarding these checks and could only guess what the checks were for.  With respect to all the checks written to Advanced Transit Mix, which total over $500,000, Manzione stated, in relevant part:

> [M]y daughter would often truck hire from me or purchase material from me since she did not have a lot of credit with her raw material vendors. If I had to assume, I would say that the check most likely was either a payment towards a truck hire, truck rental, or she purchased material from me.

(Adler Decl., Ex. E, at ¶¶ 31, 34–37, 40–46, 49–50, 52, 54, 59, 61, 64–65, 67–71)  With respect to all but one of the checks written to All American Concrete and Advanced Concrete, which total $59,400, Manzione stated: "I do not recall that specific transaction however, if I had to assume it was a payment made towards trucks that my daughter was leasing from me at the time."  (*Id.*, ¶¶ 29–30, 32–33, 38–39, 47–48, 51, 53, 55–58, 60, 62–63, 66)

At her deposition, Pastoressa was asked about a $3,700 check which All American Transit wrote to Advanced Transit Mix on January 6, 2015.  She could not recall what the check was for, but speculated that it could have been payment for a truck lease.  She also did not recall if there were records that would explain what the check was for, though she testified that she did not think there could have been "a formal agreement" between All American Transit and Advanced Transit.  (Pastoressa Dep. at  33–34)

Plaintiffs also contend that there are "repeated examples of payments made by one Manzione Company to a third-party on behalf of another Manzione Company."  (Plaintiffs' Memo at 15)  Plaintiffs have provided evidence of three such instances.  First, Pastoressa acknowledged that she used Advanced Concrete's FedEx account number to send items for All American Transit.  (Pastoressa Dep. at 70–71)  Second, on occasion, Source Construction, an All American Transit customer, received All American Concrete credit card receipts for services rendered by All American Transit.  (Pl. 56.1 at ¶ 583; Def. 56.1 at ¶ 583)  Third, Pastoressa testified that, in 2013, she signed checks on behalf of Advanced Transit Mix.  Although she had worked for Advanced Transit Mix prior to 2013, she admitted that she was not working for them when she signed the checks and did not recall why she would have signed them.

In contrast to the ample evidence of common ownership and management and interrelation of operations, there is no evidence of centralized control of labor relations. Although Plaintiffs' Memo implies that Manzione may have helped his daughter in negotiating All American Transit's collective bargaining agreement with the Union (Plaintiffs' Memo at 12 (quoting Pastoressa Dep. at 55)), the deposition testimony cited in support of that proposition proves the contrary. Pastoressa testified at her deposition that she did not confer with her father regarding the negotiations, stating, "My father has a very troubled relationship with [Local] 282 and I make my own decisions." (Pastoressa Dep. at 55 ) Manzione corroborated this testimony at his own deposition. When asked if he recalled providing his daughter with any "guidance in dealing with Local 282," he quipped: "I may have had some choice words regarding 282 that would definitely help my daughter." (Manzione Dep. at 33)

However, Pastoressa's decision to independently negotiate with the Union carries less weight than it might otherwise because it was dictated by the settlement in *Gesualdi II*. To settle *Gesualdi II*, All American Transit agreed to enter into a CBA with the Union. Pastoressa was essentially forced to represent All American Transit since her father's involvement in those negotiations would have substantiated plaintiffs' argument that All American Transit and Advanced Ready Mix constituted a single employer. Under these circumstances, that Pastoressa independently negotiated All American Transit's Market Recovery CBA with the Union does not militate against finding that All American Transit, Advanced Ready Mix, and other members of the Enterprise were a single employer.

The employees of these entities unquestionably constituted a single appropriate bargaining unit. When analyzing whether the employees of two different entities constitute a single bargaining unit, courts "look for a 'community of interests' among the relevant employees, and

23

'factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange.'" *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001) (internal citations omitted).  The employees of All American Transit, like the employees of the Enterprise, were concrete truck drivers in New York City, employed by members of the Manzione family.  As noted above, All American Transit drivers sometimes worked for other members of the Enterprise and consulted Manzione when difficulties arose.

The evidence detailed above establishes as a matter of law that All American Transit and other members of the Manzione-owned Enterprise constituted a single employer.  Insofar as defendants have adduced evidence from which a contrary inference could be drawn, that evidence is insufficient to create a genuine issue of material fact with respect to the existence of a single employer relationship.

Moreover, the incontrovertible evidence establishes that All American Transit was part of the Enterprise.  The 2014 Stipulation provided that a corporation which engaged in covered work was part of the Enterprise if Manzione was an officer or indirectly controlled the corporation through participation in management.  Manzione expressly represented to Park Insurance that he was Secretary of All American Transit, and the evidence cited above establishes that, at the very least, he indirectly controlled the corporation.  Accordingly, even apart from the single employer analysis, All American Transit is liable to contribute to the Funds for covered employment by virtue of its membership in the Enterprise.

### 2. Advanced Concrete

Although the undisputed evidence relating to Advanced Concrete is not as extensive as that relating to All American Transit, no reasonable juror could find from the evidence in the record

that there was an arm's length relationship between Advanced Concrete and the Companies. Advanced Concrete—like All American Transit and the other members of the Enterprise—is owned by a member of the Manzione family.  It is undisputed that Manzione's wife, Antonietta, owns Advanced Concrete.  (Pl. 56.1 at ¶ 44; Def. 56.1 at ¶ 44)  Although there are websites that name Manzione as a "principal" of that corporation (*see* Adler Decl., Ex. C), Manzione has submitted a declaration in which he states that he is "not an owner or principal of Advanced Concrete," that he does not control the corporation, that he does not know why the websites list him as a principal, and that the websites are "incorrect." (Manzione Decl. at ¶¶ 7–9)

In other documents, however, Manzione has not denied owning or playing a role in the corporation. First, Manzione has not objected to statements by plaintiffs and the United States Government which assert that he owned Advanced Concrete.  In their Rule 56.1 Statement, plaintiffs quote a paragraph from a memorandum submitted by the government in advance of Manzione's sentencing for tax evasion.  That paragraph states, among other things, that Manzione owned and operated Advanced Concrete from March 2014 through March 2017, and, together with his daughter, owned and operated All American Transit from June 2013 through September 2017. (Pl. 56.1 at ¶ 66 )  In disputing this paragraph of Plaintiffs' Rule 56.1 Statement, defendants address only the allegation relating to All American Transit, stating: "Catherine Manzione solely owned and operated All American until in or around 2018."  (Def. 56.1 at ¶ 66)  Defendants' Rule 56.1 Counterstatement did not deny that Manzione owned Advanced Concrete from March 2014 through March 2017.

Second, one of the written deposition questions that plaintiffs posed to Manzione asked him to describe his "role, if any, at Advanced Concrete during each of the calendar years from 2013 through 2016."  (Adler Decl., Ex. E, ¶ 9)  Manzione did not deny that he had a role, but

stated: "I don't remember." (*Id.*)  In contrast, when asked to describe his role at All American Transit during the same period, Manzione stated: "I had no role at All American Transit …, that was my daughter's company." (*Id.* at ¶ 7)

Advanced Concrete's payroll records indicate that Manzione did in fact have a role in the company, at least from late 2015 to mid-2016.  These records indicate that, from early December 2015 through July 2016, Advanced Concrete paid Manzione $2,500 a week, even though he was listed as working one hour per week or no hours at all.  (Adler Decl., Ex. X)  During this period, he was paid far more than any other employee.  Indeed, payroll records for the period from January 11, 2016, through July 31, 2016, establish that Advanced Concrete paid Antonietta only $500 a week—one-fifth of the amount paid to Manzione.[4]  This disparity shows that Manzione controlled Advanced Concrete, even if his wife was the nominal owner.

There is evidence that Manzione was doing some work for Advanced Concrete, though not enough to justify a hefty salary.  Manzione was handling insurance issues for Advanced Concrete, just as he did for All American Transit.  On January 31, 2019, a representative of Park Insurance emailed Manzione to demand immediate payment of delinquent premiums owed by Advanced Concrete, All American Transit, and two other entities. (Adler Decl., Ex. J )  Manzione did not refer the representative to his wife, but responded on behalf of all four entities.  (*Id.*)  Indeed, he did not even send Antonietta a copy of his response, though she was nominally the owner and operator of Advanced Concrete.

---

[4] Antonietta Manzione also appears on Advanced Concrete's payroll as an hourly employee from early January to mid-May 2014 and from late October to early December 2014.  During these periods, she worked irregular hours, ranging from 17.5 to 37 a week, and earned $16 an hour.  Because the Manziones' second-eldest daughter is also named Antonietta, it is unclear which, if any, of the Antoniettas listed on the payroll is Manzione's wife.  If all of the wages were paid to the wife, she was paid far less than Manzione.

In addition to the evidence of Manzione's role at Advanced Concrete, there is evidence of interrelation of operations and common management of Advanced Concrete and one or more companies owned by Manzione. Advanced Concrete's telephone number was the same as Rapid Ready Mix's. (Pl. 56.1 at ¶ 114; Def. 56.1 at ¶ 114) And there is evidence that Advanced Concrete and Advanced Transit Mix shared at least one employee: Scott Greco.[5] Indeed, Greco testified that did not know which of the corporations he worked for, even though he viewed his "responsibility as Advanced [Transit Mix]." (Greco Dep. at 16, 42)

Advanced Concrete's payroll records show that Advanced Concrete employed Greco continuously from the beginning of 2014 until the end of July 2016. Indeed, he was on the payroll for every week for which the court has records. He worked 20 hours a week from January through May 2014, 13.5 hours per week for the first three weeks of June 2014, and 13 hours a week thereafter. (Adler Decl., Ex. X) Greco testified that he was primarily a "batcher" who, on very rare occasions, worked as a scheduler of concrete deliveries. (Greco Dep. at 15) If, as Manzione claims, Advanced Concrete "just leases trucks" (Manzione Dep. at 12), the company would not have needed Greco's services. Accordingly, that Advanced Concrete continuously employed Greco shows that it, like the Manzione-owned Enterprise, was providing concrete.

As defendants' counsel correctly noted at oral argument, there is no evidence of what Greco was doing during the hours he worked for Advanced Concrete. But since Greco was primarily a batcher, he presumably was either loading trucks for another Manzione-owned company or loading

---

[5] Plaintiffs' Memo asserts that there were other common employees, but the payroll records offered in support of this assertion were redacted in a way that prevented the court from verifying it. Defendants, despite having the unredacted records, did not dispute the truth of plaintiffs' assertion. At oral argument, plaintiffs' counsel offered to supply the unredacted payroll records. Since I am persuaded that there is sufficient undisputed evidence to find, as a matter of law, that a single employer relationship existed between Advanced Concrete and Advanced Transit Mix, I decline to reopen the record.

trucks for Advanced Concrete.[6]    The former alternative suggests a co-mingling of employees between Advanced Concrete and the other company.  The latter alternative suggests that Advanced Concrete was in the concrete business, notwithstanding Manzione's insistence that it was not. Thus, either alternative suggests interrelation of the operations of the companies.

The informality of the relationship between Advanced Concrete and the Enterprise is also evidenced in Advanced Concrete's leasing operations.  Manzione testified that Advanced Concrete leased trucks to at least one of his companies.  (Manzione Dep. at 24)  However, the leasing arrangements were oral, and Manzione did not receive a receipt after the trucks were leased. (Pl. 56.1 at ¶ 172; Def. 56.1 at ¶ 172)  Indeed, Manzione could not recall if there had ever been a "written arrangement for the leasing of the trucks," stating only that there "may have at one time." (Manzione Dep. at 24–25)

In light of the foregoing, no reasonable juror could conclude that there was an arm's length relationship between Advanced Concrete and the Enterprise.  Manzione did not deny that he had a role at Advanced Concrete.  Indeed, the corporation's payroll records and Manzione's emails to Park Insurance show that he controlled Advanced Concrete.  This evidence, in addition to the evidence of the interrelation of operations and the informality between Advanced Concrete and Manzione-owned companies, compels the conclusion that Advanced Concrete and the Enterprise were a single employer.  Any contrary inference that could be drawn from the record evidence is insufficient to create a genuine issue of material fact with respect to the existence of a single employer relationship between Advanced Concrete and the Manzione-owned Enterprise.

---

[6] Even when, on rare occasions, Greco worked as a scheduler, that was work related to the delivery of concrete.

C. <u>Manzione's Personal Liability</u>

Generally, "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). The Second Circuit has recognized, however, that "special circumstances, beyond an individual's officer status or corporate duties, might warrant the imposition of personal liability for a corporation's ERISA obligations." *Id.* "[A]n individual officer or director may be held personally liable for the corporation's delinquent contributions …, for example, if 'piercing the corporate veil' or 'alter ego' liability can be proven; or if the individual defendant commits fraud, acts in concert with a fiduciary to breach a fiduciary obligation; or if the individual officer or director personally assumes the obligations of the company under the collective bargaining agreement, thereby qualifying individually as an 'employer' under ERISA." *Blackburn v. Iversen*, 925 F. Supp. 118, 122–23 (D. Conn. 1996).

Plaintiffs seek to hold Manzione liable on the theory that he defrauded the Funds. The Second Circuit has "held that 'to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C. § 1132.'" *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 32 (2d Cir. 1994) (quoting *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 388 (2d Cir. 1989)). "In analyzing whether an individual should be held liable for ERISA payments due to fraudulent conduct, courts engage in a two-step inquiry." *Trustees of the United Plant v. C.P. Perma Paving Constr., Inc.*, 2016 WL 1029507, at *2 (E.D.N.Y. Mar. 9, 2016). First, a court must consider whether the individual is a "controlling corporate official," which requires an examination of "the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Lollo*, 35 F.3d

at 33.  Second, the court must consider whether the plaintiffs have established the elements of common law fraud.  *Id.*[7]

In this case, the evidence establishes that Manzione was a controlling corporate official in both All American Transit and Advanced Concrete and used those corporations to defraud the Funds of required contributions.  First, although Pastoressa nominally owned All American Transit, the corporation owed its existence to Manzione.  As discussed above, Manzione provided the trucks and his wife provided the yard in which the trucks were stored.  Manzione also provided the raw materials necessary to make the concrete, since other vendors were unwilling to extend credit to the startup.

Manzione effectively owned and controlled All American Transit.  He, along with Pastoressa, interviewed Mendes, who was subsequently hired to run the business.  Since Pastoressa had limited experience in the concrete industry, Mendes and drivers alike turned to Manzione to make all consequential decisions regarding the business.  Even though Pastoressa was the corporation's president and sole shareholder, Manzione told Greco that he owned it.  His ownership was obvious to customers like Kennedy and also evident from the fact that the corporation's credit card was being used to pay for Manzione family-related expenses, such as college tuition and family vacations.

Second, Manzione's clandestine control of All American Transit was a transparent effort to defraud the Funds.  Shortly before All American Transit was created, the Funds filed an involuntary

---

[7] To recover under a theory of common law fraud in New York, plaintiffs must prove "1) a material false representation or omission of an existing fact, 2) made with knowledge of its falsity, 3) with an intent to defraud, and 4) reasonable reliance, 5) that damages plaintiff[s]."  *Lollo*, 35 F.3d at 33. As noted above, "plaintiffs must demonstrate liability by clear and convincing evidence."  *Marini*, 995 F. Supp. 2d at 178.  That "standard … applies at the summary judgment stage as well as at trial."  *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009).

bankruptcy petition against Advanced Ready Mix, seeking to liquidate that Manzione-owned business and recover contributions owed to the Fund under the terms of the CBA to which Advanced Ready Mix was a signatory. Around the time that petition was filed, All American Transit—then a non-union entity—began operations using trucks owned by Manzione. Although Manzione claims that these trucks "were in the junk pile" and that Pastoressa had "her mechanics get [them] on the road," (Manzione Dep. at 10), there is no evidence that Pastoressa, a 22-year-old, recent college graduate without "that much" capital, had her own mechanics or the wherewithal to hire them. In fact, All American Transit's dispatcher, Mendes, who was hired to run the business and did precisely that, testified that Advanced Ready Mix's trucks and drivers were regularly performing work for All American Transit.

Manzione initially had no formal role in All American Transit. But after the August 2016 Agreement that resolved *Gesualdi II*, in which All American Transit agreed to enter into a CBA with the Union, Manzione was openly involved in important aspects of the business. He communicated with accountants about All American Transit's taxes and, along with Pastoressa, was charged with tax fraud relating to All American Transit's failure to pay those taxes. He was centrally involved in the Park Insurance litigation in which he claimed to be the Secretary of All American Transit and to be fully familiar with the relationship between that corporation and its insurer. He alone responded to Park Insurance's demand for delinquent premiums owed by All American Transit. Indeed, the emails relating to the delinquent insurance were not even copied to Pastoressa. Accordingly, there is not just clear and convincing, but overwhelming, evidence that Manzione defrauded the Funds.

Similarly, the evidence establishes that Manzione owned and controlled Advanced Concrete and that the non-union corporation was used to defraud the Funds. As explained above,

31

defendants did not expressly deny that Manzione owned the corporation.  That Manzione was paid $2,500 a week from late 2015 to mid-2016—five times the amount paid to Antonietta—compels the conclusion that he, not his wife, owned Advanced Concrete.  And that he alone handled insurance issues for Advanced Concrete, without even copying Antonietta on his correspondence, support the conclusion that he controlled the corporation.

Manzione asserts that Advanced Concrete "just leases trucks" and was not involved in concrete delivery.  But the record reflects that, in every month for which the court has payroll records, Advanced Concrete employed Scott Greco.  Greco testified that he was mainly a batcher or, on very rare occasions, a scheduler, so he was presumably either loading or scheduling trucks.  Since these are jobs relating to concrete delivery, this evidence strongly supports plaintiffs' contention that Advanced Concrete, a non-union entity, was not just leasing trucks but was performing work covered by the CBAs with Local 282 without paying contributions.

In light of the undisputed facts set forth above, a reasonable juror would have to conclude that Manzione had operational control of both All American Transit and Advanced Concrete and used these corporations to defraud the Funds.  When Advanced Ready Mix was threatened with involuntary bankruptcy, he provided the trucks and other resources to create All American Transit—a non-union ready-mix operation which he admitted owning.  In addition, he controlled Advanced Concrete, another non-union entity which, judging from its employment of Greco, also performed concrete work.  Accordingly, I hold that Manzione is personally liable for contributions owed to the Funds by those corporations.  Insofar as defendants have adduced evidence from which a contrary inference could be drawn, that evidence is insufficient to create a genuine issue of material fact with respect to Manzione's personal liability.

D.  Issues regarding Calculation of Damages

Plaintiffs' Memo raises several arguments relating to calculation of damages, three of which are still before me.[8]  First, plaintiffs argue that All American Transit's contributions for the period from its inception in 2013 until May 1, 2016, must be calculated by reference to the Concrete Producers CBAs in effect during that period, not the Market Recovery CBA.  I agree. All American Transit's liability for this period is predicated on the finding that All American Transit, Advanced Ready Mix and the other members of the Enterprise were a single employer. Accordingly, All American Transit is liable for the contributions at the rates set forth in the Concrete Producers CBAs, since these were the CBAs to which Advanced Ready Mix and the other members of the Enterprise were bound.

Second, plaintiffs contend that there is no evidence to substantiate Advanced Concrete's claim that its drivers did not perform "ready mix" work covered by the Concrete Producers CBAs. As discussed above, that Advanced Concrete regularly employed Greco, a batcher, establishes that Advanced Concrete was involved in concrete work.  While the submissions currently before the court do not establish which drivers employed by Advanced Concrete performed covered work under the terms of the CBAs, the parties will have the opportunity to provide that documentation in the subsequent damages phase.  If the parties are unable to agree on damages, I will refer this case to Magistrate Judge Levy for the calculation of damages and will leave the determination of what documentation is necessary to determine the scope of the covered work to the magistrate judge.

---

[8] At oral argument, plaintiffs' counsel expressly withdrew a fourth argument:  that the Companies failed to submit to audits for the period from 2017 to date and that the Funds are entitled, under the terms of the Trust Agreement, to recover estimated monthly contributions from the Companies for this period.  (Tr. 22)

Third, plaintiffs argue that All American Transit has not provided sufficient evidence to establish that no contributions were owed for some of its employees for certain dates because those dates fell within the first 15 days of the employees' probationary periods.  The parties agree that the Concrete Producers 2016 CBA provides that no contributions need be paid for the first 15 days of a new employee's 30-day probationary period, provided that the new employee is not already a member of the Union.  (Pl. 56.1 at ¶ 1196; Def. 56.1 at ¶ 1196)  The Funds' auditor, Diego Remache, concedes that Pastoressa provided the Fund's auditors with a short, typewritten list of the start dates of All American Transit's employees.  (Declaration of Diego Remache at ¶ 25 & Ex E)  However, plaintiffs argue that the auditor was not provided with evidence to substantiate the list and to establish that the "new" employees had never previously performed covered work for another Manzione-owned company.

In response, Defendants' Memo asserts that payroll records showing the relevant start dates were provided in response to a subpoena plaintiffs sent to Paychex.  These records, attached as Exhibit A to the Declaration of Catherine Manzione Pastoressa in Opposition to Plaintiffs' Motion, do indeed provide the start dates and payment histories for All American Transit employees.  Although they do not indicate whether the employee was already a member of the Union when hired by All American Transit, the records list the last four digits of each employee's social security numbers.  Given this information, the Funds should be able to determine from their own records whether a given employee was already a Union member.

Plaintiffs' Reply Memo does not explain why the payroll records attached to the Pastoressa Declaration are inadequate.  Rather, plaintiffs continue to assert that the only evidence offered to support the probationary status of the employees in questions is a single typed piece of paper, with no indication of what records were used to prepare the list.  This assertion is incorrect.  The payroll

records, along with the Union's own member rolls, should be sufficient to permit the Funds to verify which of the employees listed by All American Transit are probationary employees and to determine the contributions owed by these employees.  Accordingly, I will not direct defendants to provide additional information relating to the probationary employees.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for partial summary judgment as to liability is granted with respect to the claim that All American Transit, Advanced Concrete, Advanced Ready Mix, Advanced Transit Mix, Rapid Ready Mix, All American Concrete Supply, and the other members of the Enterprise constitute a single employer.  However, I note that plaintiffs agreed in their letter dated July 17, 2022 (ECF Doc. 118, p.1, ¶ e) not to seek to recover remittance report-based amounts awarded in the partial final judgment against All American Transit from any party to this action other than All American Transit.

Summary judgment is also granted to plaintiffs on their claim that defendant Rocco Manzione is personally liable for contributions owed to the Funds by All American Transit and Advanced Concrete.

Finally, I find, under Rule 56(g) of the Federal Rules of Civil Procedure, that, in calculating damages, All American Transit's contributions for the period from its inception in 2013 until May 1, 2016, must be calculated by reference to the Concrete Producers CBAs in effect during that period, not the Market Recovery CBA.

However, I cannot determine, based on the submissions before me, whether and to what extent Advanced Concrete drivers performed covered work or whether the All American Transit drivers named on the short, typewritten list provided by All American Transit to the Fund's auditors

were probationary employees.  Therefore, with respect to these two issues, summary judgment is denied.

The parties are directed to confer within 30 days of the date of this Opinion and Order in an attempt to resolve these two issues and to determine the amounts owed to the Funds by All American Transit, Advanced Concrete, and Manzione.  If they succeed in reaching an agreement, they shall submit a proposed judgment.  Otherwise, the parties shall inform the court that they are unable to reach an agreement and I will refer this matter to Magistrate Judge Levy to determine the amounts owed to the Funds.

**SO ORDERED.**

/s/
**NINA GERSHON**
**United States District Judge**

February 26, 2025
Brooklyn, New York